My name is Tom Woodbury and I'm representing the appellants in this case, which is a case that basically calls into question this court's whole proxy-on-proxy doctrine of methodology for ensuring species viability. I wanted to highlight page 301 of the excerpts of record, which is a map, a graphic sort of depiction of the impacts of grazing management, which is herbicide application, burning, et cetera, grazing on sage-grass habitat in the Antelope Basin. What you have on that map is the orange areas, which were identified in 1991 by the Forest Service and the Gravely Sagebrush EIS as basically historic sage-grass habitat, sagebrush habitat. And then the dark green is more recent, I'm sorry, it's the GIS information, an overlay from, again, Forest Service information provided by satellite imagery of sagebrush habitat in 2001. And then the circles depict 101 existing water troughs, which are for the purpose of grazing, basically giving the cows water. And then there is some dispute between plaintiff's experts, I'm sorry, appellant's experts and the Forest Service over the level of impact from those water troughs. And we have, so related to those 101 circles, each of which on this map has a half-mile diameter around it, half-mile impacted area, which is the impacted area according to plaintiff's experts. Plaintiff's expert provided pictures to illustrate the effects of watering and salt licks, water troughs and salt licks on the surrounding sagebrush habitat, and that's at ER 252 and a few pages after that, which shows very graphically bare ground in the immediate vicinity and then basically sagebrush-free grassland in a wide area around that. The Forest Service maintains that only 20 feet radius actually is impacted by those facilities. I think this saves you about a thousand words from me of just showing, you know, what the concern is about whether there's a significant environmental impact or not from sage grouse. I'm sorry, from grazing management on sage grouse and sagebrush habitat, because this case is not just about sage grouse. It's about sagebrush habitat, which is the most diverse, biologically diverse habitat in North America, with about 350 different species of animal and plants associated with that habitat. The Forest Service in this case refuses to do an environmental impact statement analyzing the cumulative impacts of decades of almost a century of grazing and then decades more recently of poisoning through aerial application of herbicides and burning repeatedly to eradicate aggressively, according to the Forest Service's own admission, sagebrush habitat in order to promote species of plant more palatable to cows. Where on the map is the 119 acres that the Forest Service expert thought was suitable for breeding? The Forest Service... Can you show that to me on the map? That's all I'm asking. I believe it would be in the area of the... I'm not... I'm sorry, I'm not clear from the record where the leks, the sage grouse leks are located, but he was addressing the Missouri Flats Lek, which is, I believe, to the northeast in the white area of private land. I think the leks are outside of the area. The leks are definitely outside of the project area, but the nature of the dispute between the Forest Service experts, I'm sorry, yeah, Forest Service experts in the NEPA process and plaintiff's experts was whether or not the area provides breeding habitat for the sage grouse, which is nesting and early season breeding habitat. I guess I don't understand why that would necessitate an environmental impact statement if the leks are outside the area under consideration. You know, would you educate me regarding why? Sure. Yeah, the relevance of the leks is just to provide data about populations. So basically, the way you monitor populations is by monitoring the associated leks for any habitat. So the leks, though, are basically just breeding grounds. I mean, it's basically mating grounds. I'm sorry, just mating grounds. But then after mating, the hem of the sage goes anywhere up to 12 miles from the mating ground, which is bare ground to find suitable nesting habitat. So basically, the reference from Judge Fletcher to the experts, the supplemental information report, I'm sorry, the Connolly report that was prepared during litigation, was just with regard to the existing suitable habitat associated with that lek. He does not address the cumulative impacts, in other words, historic suitable habitat nesting, but recognizes the supplemental information report itself, that the Forest Service provided documents at page 158 of the administrative record, 19,445 acres of nesting habitat in the allotment areas and 22,866 acres of brood-rearing habitat in the project area, in the allotments. So that's 46% of all of the nesting habitat associated with those leks and 70% of all the brood-rearing habitat. So basically, while the leks themselves are not in the project area, most of the suitable nesting and brood-rearing habitat is. And even the plaintiff's own expert recognizes that the location of the leks is relevant to knowing what's going on with the population, but it's not necessary to ensure viability because they will establish new leks anywhere in the vicinity of suitable habitat. Is this the case where the sagebrush was designated as the MIS, but yet there are none in the area? It is, Your Honor. I don't understand that. I don't either, Your Honor, other than what we have from the population data was that around the time the Forest Service began its aggressive sagebrush eradication program in the 60s through the 90s, we had viable populations in the project area of sage-grouse associated with this habitat. The Montana Department of Fish, Wildlife, and Parks, which is designated by the Beaverhead Deer Lodge as the monitor of populations, characterizes the project area as suitable, or I'm sorry, historic sage-grouse habitat, and the Forest Service somehow disputes that, but nonetheless we know that there were sage-grouse there before they started eradicating habitat and there aren't today. Is there any evidence of any grouse in the area after 1971? Yes, there is. Actually, as recently as I think 2001, there have been illegal hunting of sage-grouse in the project area. Where is that in the record? It's in the Montana population data and the letters provided by Montana Department of Fish, Wildlife, and Parks. It's in the excerpts. Actually, I think that one of the leks actually has had populations all the way into the 80s or 90s, so the 1971 date was not when the populations disappeared. They just were already plummeting at that point. Is there a distinction between the NEPA requirements and the Forest Service Management Plan requirements? Yeah, obviously there's an interplay there. Let me speak to the Forest Act first. This court, in both the Rittenhouse decision and the Powell decision, was very clear that in approving the proxy-on-proxy methodology substituted for population trend monitoring by the Forest Service, the assumption was that the habitat proxy was a valid proxy for existing viable populations, and as long as they continue to provide that habitat, then they don't need to monitor the populations, even though the old regulations, and in this case the Forest Plan, required them to monitor those populations. So the question becomes, here the Forest Service is relying on proxy-on-proxy methodology, even though the MIS, the indicator species, is gone. And this is the part that I think is particularly troubling. In spite of the absence of the indicator species from the habitat that it used to inhabit, there's no evaluation of the impact on other species, including sensitive species that rely on sagebrush habitat. There's absolutely no evidence in the record of the cumulative impacts of burning and poisoning and grazing on all the species which the indicator species is a proxy for. Now, what should they have done? Should they have chosen another species that is the indicator? Well, that is certainly the Tenth Circuit's position. This Court has never dealt with that issue directly, except the Tenth Circuit relied in part on this Court's rationale and Inland Empire decision that the indicator species requirements of the Forest Act apply at both the forest-wide scale and project-by-project. So that's why the Tenth Circuit says, if you have a project and the indicator species designated for that habitat cannot be found, such as lynx or, in this case, sagebrush, then, yeah, you have to find another suitable or a range of suitable indicators. We would maintain that, actually, once that indicator is gone, the proxy has failed, and at least you need to look closely at sensitive species. But, actually, there's evidence in the record here from the sagebrush EIS in 1990 that pygmy rabbits and burrowing owls were there and are now gone and were affected by burning. What do we make of, I think it was Connolly who said that the conditions within the area were similar to areas where there hadn't been any eradication, that they looked to be about the same? Well, about the same, except with some very important distinctions. He was referring to the Cliff Lake area, I believe, and we addressed in detail in our brief the problem with that analysis. He only went so far, and the main distinction is the presence of suitable tall grass and forbs, residual vegetation, basically, and what we pointed out very specifically in our briefs is that for the allotments, there's an absence of that kind of residual vegetation, and that's the main impact from grazing and the main concern from the plaintiffs and their experts in this case is that the three to five inch residual standard that the forest has in riparian areas does not provide at the end of the season. Then you have snows, and then when the snows melt, there's not adequate cover for sage grouse to nest. If they did nest there, they would lose their chicks to predation because they can't cover them. If what you're saying is true, wouldn't one expect to see sage grouse in the areas that have not been treated? Well, you would have a difficult time finding such areas. Almost all of the orange on that map is areas that have been burned. Almost the only areas that haven't been burned are the green areas, and that's after the application of herbicides in the 60s, and one thing that we didn't really emphasize in our briefs, but our expert in their declaration in the record emphasized, is the incredible fragmentation of habitat from all the hundreds of miles of fencing, piping, roads, and so on. So the existing habitat that there is is highly fragmented. The fact that you might have a pocket of suitable nesting habitat today versus what was there 40 years ago or 50 years ago doesn't necessarily mean that the sage grouse are going to find that to be suitable. Currently, what evidence is there of where they come to these two lakes that we've identified to breed? Now, where do they go from there? What evidence is there in the record of where they do their nesting? Well, they're not there anymore. I don't believe they are. I mean, right now, there are other sage grouse across the border in Idaho, I believe, but the populations that were there were basically migratory. And now they're not currently using those lakes? They're not currently using those lakes. So basically, the relief you want is for an EIS to be done? Yeah. You know, one thing that the Forest Service in their briefing tries to do is make it sound like it's just two experts. You know, the plaintiffs only have two experts. But the fact is, if you look at Hockett, who's actually a leading expert, and the declaration that he provided in the administrative process, his published paper and peer-reviewed paper, I think Hockett 2002, is a peer review, and he cites to numerous other experts and other science in his declaration. So it's actually he marshals a whole army of experts to support his contention about residual vegetation, that the three- to five-inch standard is not suitable. At least seven inches is required at the end of the season. And also that upland of the riparian areas, the Forest Service doesn't even identify residual heights at the end of the season. So as a practical matter, if an environmental impact statement were done and it showed that the cumulative effect has resulted in a loss of habitat, then would it be incumbent upon the Forest Service to reestablish the vegetation or whatever is necessary in order to lure back the sage-grouse? Is that the ultimate goal? Yeah. There's lots of recommendations from Hockett in his declaration and in the published papers about setting areas aside, like about a quarter, 25%, I think, approximately, of areas to be set aside throughout the landscape with no grazing for 10 years to allow reestablishment. But then that would impact the farmers or the rangers. They'd have to reduce stocking levels. They refuse to consider any of those recommendations or reductions in stocking levels solely on the basis of no breeding habitat in the project area, which is consistent with the gravelly sagebrush EIS,  And then in the litigation when they had Connelly go out there, you know, lo and behold, there's lots of breeding habitat. So we say, well, you have to go back and respond to all of that science and all of that. You have one minute left. Do you want to say that for rebuttal? Yes, thank you very much. May it please the Court, my name is Robert Oakley. I'm here on behalf of the Forest Service. We also have Mr. Bloomquist here on behalf of the interveners. The allocation of time that we've agreed to is 15 to 10, but I'm going to continue to answer as many questions. It's not 15 to 10. I'm sorry, 15 to 5. You're right. It's not 15 to 10. I'm trying to give this extra five minutes. Try to give this extra five minutes. Let me get started because I have a number of mistakes that were made in the opening arguments that I think are very important to correct. The first mistake, or not maybe the first, but one of the many, many mistakes that was made in the statements made to you, goes to a question or a comment Judge Rollins and you made, which was, well, why did the Forest Service pick the sage-grouse as an MIS for this project area when they aren't there? The answer is they didn't. They picked the sage-grouse as a management indicator species in the forest land for the entire forest. These two forests total 3.2 million acres, and so when they're looking for indicator species, they can't say, yes, we know this species will be in every part of the forest. But if it's a proxy for habitat and it disappears, doesn't that tell you something about the habitat, that the habitat is? The record supports that it doesn't in this case. First, the studies that show that this was available, that there were ever sage-grouse here, show it on the periphery. The Montana letter that counsel referred to says, never quantifies it. He just says there probably were sage-grouse in the area. There is one lek now enacted. By the way, the other lek, I believe the fish creek lek, the last I saw it as reflected in district court opinion, it is active. It's somewhat further away. The nearest lek- When you say it's active, you mean that there are sage-grouse? There are, as discussed in the district court opinion, unless it's gone inactive, and I've not been informed of that in the Forest Service, but on the record we have the last information in the record is that it was active. But it was always on the periphery, and the reasons on the periphery is this is both a very high area and it gets a lot of snow, and the snow is problematic for the sage-grouse because it covers up too much of the sagebrush, so it delays the development of the sage-grouse, I'm sorry, of the habitat, and prevents the sage-grouse. So there's no evidence that they were ever really there in any significant number. So you dispute the fact that there's been, you know, And I would hope that the court has a chance to look at my excerpts of record, the supplemental excerpts of record at pages 129 and 130. In there they list every single spray application in the project area, some of which for some years are as small as a quarter of an acre. But it still exists. It still exists, but it stopped in 1974. So it's your position that the record reflects that there has been no application of pesticides to the area since 1974? That is not in dispute, Your Honor. Okay. Then if you turn to the next page, page 130. How about the burning? That's what I was going to. Page 130, Your Honor, is the burning. Now you'll see there that burning for range improvement stopped in 1993. Now that's not to say that there was not burning for other purposes. Fire is a natural part of the environment, but in terms of producing Controlled burning, I think that's it. Yes. And, again, these areas on an individual year are quite small. Guess what? Controlled burning took place until when? Well, controlled burning for things like stand modification goes up to the year 2000. Now the amendments, these AMPs that this whole case is about, are there to improve conditions, riparian conditions, which will benefit the sage grouse, it will benefit other species as well. Upland pasturing has been cut back by 55 percent. Counselor, here is my confusion. If the goal of the Forest Service is to improve the conditions in the forest, why would the Forest Service be resistant to doing an EIS? Well, because an EIS, as Your Honor knows, is an extraordinarily difficult, it's a very intensive application, and where the reasons that you've been given why we have to do an EIS is that pesticides were used, but they weren't used since 1974. Has there been an EIS in that area since 1974? This is tiered to an EIS in the Gravely Mountains area, so there's been a general EIS, but this is for this one small, this is 48,000 acres out of a very large forest area, 3.2 million, and it's an area that's always been on the periphery of the sage grouse. Let me ask this, Counsel. What additional really would have been done if they'd done an EIS? You say it's very complicated and a lot more required. Here, it seemed to me they did an EA, which had some options, and then they put it out for public comment, and they made some considerable revisions after they got that public comment. What else would the EIS have required to be done? Your Honor, it's hard for me to speculate. Of course, it would be guided by, I hope I don't get this opinion from the court, but any opinion from this court saying what was deficient. Well, that's what I'm asking. I'm not really sure. In that sense, I think this EIS, if you look actually at the CEQ regulations, and if you go back to the 1980s and look at some of the early EAs, they're like 10 pages. As we've seen, there's been a creep in EAs where instead of being a short document, they're now long. I just know that every EIS I've worked with, the EIS is usually two volumes itself, and the supporting record's usually 10. But you can't really tell me what additional would be required for an EIS? Well, the plaintiffs seem to think that. No, I don't know what you think. Well, I don't think it's needed, so that's my initial problem. My question. I think this is, to me, this is as good as an EIS. Counsel, your response to my question, I asked you why didn't the Forest Service want to do an EIS, and you said it was a major undertaking. No, I'm sorry. Then I totally misunderstood your question, Your Honor. The Forest Service did not want to do an EIS. The Forest Service found no significant impacts here. The proxy-on-proxy use of habitat makes sense for a lot of reasons, and it was recently reaffirmed in this Court's en banc decision in the Lands Council case last July. But they didn't in that case say that you could use habitat rather than species for your proxy-on-proxy, did they? They said the only time they did not address that specific issue, but if you could find the species, then you should do that and you shouldn't do the proxy-on-proxy. What they did say is that the only time that they had disallowed proxy-on-proxy is when the underlying methodology was out of date, where there was no clear connection between the species and the habitat. In other words, there were methodological problems. There are no such methodological problems here. Conley is a recognized expert. He was cited in the district court by NEC repeatedly. Everybody relies on him. Conley's guidelines were used by the Forest Service. That's not disputed, and they couldn't find any significant difference between the grazed areas and what the guidelines required and this research area, which had no spraying, no burning, totally natural area. And they couldn't find any difference. So they're finding no significant impact here on the sagebrush, which serves not just the sage grass but other species as well. Counsel, if we were to say that this EA is adequate, then are there certain other things under the Forest Management Act that would be required of forest management? They look at this report. Is there something positive? The EA is just advice to them. So then we go to what the forest management does with that. And are there things that they should have done in response to that that haven't been done? No, actually what they have done is followed through on the EA, followed through on the material that they got from Dr. Conley. They are improving riparian conditions, which is very important. They're keeping cattle away from streams, streams where some of the other MISs, like the grayling, the Arctic grayling I believe, the fish spawn. They're going to improve stream quality, as the district court points out. That will indirectly benefit the sage grouse because it will allow for growth of forbs on these protected areas of the stream where grazing is going to be restricted. They will continue to restrict grazing. Now we point out in our brief there is nobody, and that includes your guy Hockett. If you read his so-called peer-reviewed report, he says, and we quote him in our brief, there's no established connection between grazing and harm to sage grouse. Dr. Conley says it. Other people say it. Now, I grant you, Mr. Hockett, with his BA, does say in his litigation declaration that there's a connection, but he didn't say it in his peer-reviewed paper. And Conley, everybody says we just don't know. In fact, some people say there's actually a benefit to grazing. But remember, too, they're talking about grazing in general. Grazing is highly regulated here. Grazing is regulated in the sense that they rotate the pastures. It's not like some rancher who owns his land and can do whatever he wants to with his land. So to what does the Forest Service attribute the disappearance of the sage grouse? Well, to begin with, as we point out, as the EA points out, 87% of sage grouse habitat is not on Forest Service land. And the Forest Service is not clear on the answer. It did not answer in the EA, and it felt it was outside the scope of the EA, to determine why in the state of Montana there has been a general decline. I think conversion of land to agriculture is certainly an obvious reason. If you're continually plowing up ground, I think the literature would support that that's going to obviously tear up the sage grouse and deprive the habitat for the species. Predation, in some cases, if you're close to housing developments, which this project is not, where there are dogs, foxes, things like that. Does the record reflect the complete absence of sage grouse in this area on the map? Well, I've got to tell you, I don't know what this map really means. Antelope Basin. The best evidence is that there have been some signs of them. There's a report that two were taken illegally in 2002, which Mr. Woodbury referred to. There's also been some attempts to find them, to survey them. And, of course, there are annual surveys that the state that, I'm sorry, that the Forest Service relies on the state to do. And they just have not found any permanent, any example of nesting or brooding. And, by the way, that's an important distinction. I think we get another misconception that gets introduced here is to confuse nesting versus brood rearing. There was, and I think the figure has been tossed around incorrectly, I think it's Dr. Conley found in his supplemental report, 1,900 acres of land that could be used for late brood rearing. And by brood rearing, it means the chicks have been born, and they're with their mother, but they're not nesting anymore, they're moving around. Well, why, this is a very small area, and Conley said it would be helpful to protect it, and this other expert said, why can't you do something with that 119 acres that is close to the lake? Well, it's, I thought the figure was 1,900 acres, although I'd be better off with 119. It is 1,900 acres. But we are continuing to monitor the situation, and if there were a population showing up that, I mean, the Forest Service could take action, but at this point when there's. . . The chicken or egg dilemma. I mean, if they show up, you'll protect them, but if they, you know, they can't show up unless you protect them. Well, no, they can show up, and again, because. . . There should be habitat there that's hospitable before they show up. That's right, but that's what the record shows. The Forest Service did two things, and this is, I think, would meet this Court's standards, even pre-Lands Council on bond decision. It looked, it did on-the-ground examination here. It looked at these grazing allotments and compared them to the Conley guidelines. It had Dr. Conley come in afterwards and look at it, and he says the conclusion in the Antelope Basin Elk Lake Allotment Management Plan revised are reasonable and supported by available evidence. Effects to sage grousing resulting from project implementation will likely be minimal. That's page 151 of the appellant's excerpt. The problem with that is it talks about a discrete project, and what the appellants want is an examination of the cumulative impact of all of the projects that have been undertaken in that area. Well, again, you go back to those pages that I cited from the excerpt of record, and you'll see what those, how small they are. They've been grossly overstated. They're pages 118, I'm sorry, 129 and 130. And when you get an acreage total, you're getting an acreage total, for example, on spray application going all the way back to 1960. And let me give you one example of how this really wasn't having much effect. If you go from page 129 to page 130, you'll see references to prescribed burning. And the reason the burning was done, actually, was that the sage had recovered from the pesticide use, but the pesticide use in any event stopped in 1974, no dispute in the record, and the burning to control sagebrush stops in 1993, and there is no plans for any, there is nothing in the AMTs to provide for either application of pesticide or burning in the future, nothing. Turning back to this 1,900 acres, I'm looking at Connelly's report on page 11, which is 172 in the excerpt. He says a small portion of the assessment area is likely breeding habitat. Potential breeding habitat occurs in the Elk Lake allotment and is roughly six miles from an active lake at the Fish Creek Lake. This area encompasses 1,900 acres in the southwestern corner of the assessment area. He goes on to say the area seems to have all of the characteristics associated with protective sage-grouse breeding habitat. Given the current status of the greater sage-grouse populations, the proximity of this area to at least one active lake and the condition of the habitat, it would be prudent to assume that this allotment provides sage-grouse breeding habitat. Could you give me your page numbers again, Your Honor? It's on page, I was reading from pages 173 and 174. Okay, thank you. Of the record, and it's page 173. So are you saying that that is coastal lake? It's potentially very good habitat. Why didn't they just protect that and move on? Well, again, there's no connection showing. Two things. You've got to remember that because of the snow cover, we're talking about late in the year, these birds normally breed and lay eggs in March, April, and the cows are not even allowed up there until June 15th and in some areas July 1st, and at least one of those July 1st areas is in the 1,900 acres that Dr. Connolly is talking about. So likely, if there were any birds, they'd be gone. Well, he says the lek is active and this area would be good for it. Yes, he's referring to the Missouri Flat Leks. Although that one actually is, yeah, he's saying Missouri Flat, so that's the one that's inactive now. It was active as recently as the 1980s. No, he says it's within six miles of an active lek, which is the Fish Creek Lek. Yes, that one's still active. That's correct, and in fact, by the way, as the district point points out, it hit the last numbers, the numbers were actually going up. So I think it's several things. Again, I would urge you to look at our briefs. We go through the published literature and it just says nobody knows that there's a connection between grazing and harming sage-grouse. It also goes on, one person says, one respected expert says it could help. And remember, too, that's talking about grazing in general. Add that to the fact that this is very late seasonal habitat for these birds so that they're likely, and it's also late habitat for the cows to be allowed to birth, that there's just no showing of harm here. There's just nothing in the record to show that letting these cows in here, I'm assuming everything here, that the birds are there, we let the cows in there. There's just an absence of causality. It's interesting, most of the oral argument from Ms. Woodbury was about the burning and the pesticide stuff, which we shunned stock, in some cases, what, 24 years ago. Let me ask another question. Did the Forest Service, after it got the CA, which for the moment I'm assuming is completely adequate, should they have done something to take another indicator species to see what else was going on in the area? There are all kinds of other animals and birds, so why are we fighting so much about one that doesn't exist when there are lots of others that might need protection? The sage-grouse was chosen because its habitat functions as a habitat for a bunch of species. So it's not that there's some relationship between the sage-grouse and these other species on the one hand. It's that there's a relation between the sage-grouse's habitat and the other species. So the habitat's really the key, and by looking at the habitat and saying, it's good enough for the sage-grouse, they're finding that it's good enough for the other species. It's not good enough for the sage-grouse because there are no sage-grouses there. No, I have to disagree with you, Judge Rawlinson. Connelly says it's fine. Connelly's guidelines say it's fine. But there are none there. That just defies common sense to me, that you say this is fine, but it didn't sustain the population. That just is counterintuitive to me. I think the problem is, Your Honor, is I think you need to look very hard at what they cite for a population in the area, which is the Montana letter, which never says anything about any numbers. This is always on the periphery. In other words, the habitat may have always been fine, but for reasons that the Forest Service can't control, which is how high the habitat is and how much snow this area gets and how much snow cover there is on the ground, there were just never many sage-grouse in this particular area. So it wasn't that we drove them out. I mean, they cite stuff for Lewis and Clark saying they blackened the sky. Well, maybe they blackened the sky for Lewis and Clark, but Lewis and Clark weren't concerned about this 48,000 acres. Let me ask you this. Did the Forest Service implement all of the recommendations that were given by Mr. Conley? Yes, Your Honor. They discussed that in the supplemental information report and what they're doing with Conley's recommendations and how they're going to carry them out. Okay. You've exceeded your time. I know. I'm sorry. We'll give the intervener two minutes. May it please the Court, for the record, my name is John Bloomquist. I'm here on behalf of the permittee intervenors to address the question regarding Elk Lake. Elk Lake is this area down here in Elk Lake, Alaska. And if the Court would look to sit supplemental excerpts of record at page 106, which is a supplemental information review, Dr. Conley talks about this 1,900 acres and that the condition there is suitable for nesting habitat. So the 1,900 acres that he identified, he also identified as having suitable habitat. That is confirmed as well in the Forest Service 2002 report on the condition of the allotment and various pastures within the allotment. And I would point the Court to sit supplemental excerpts of record at 6. So this area that Your Honor asked about, the Elk Lake portion of the allotment and its nesting habitat suitability, these conditions are there under the Conley guidelines to be suitable. As counsel for the government pointed out, the key thing to remember regarding nesting is the season of use when livestock come in. And livestock are not authorized on the allotment, on all portions of the allotment, until after the nesting season would occur. So even if nesting sage-grouse would come into this area and nest, the time cattle come onto the allotment, they will be removed before they would disturb the hens, trample the nests, and those types of things. But is there any evidence that the area is harmed by grazing? No, Your Honor. In fact, as the district pointed out, the evidence in the Forest Service studies were based upon the Conley guidelines. Conley is the best science on sage-grouse, sagebrush habitat. And as the Forest Service studies indicated when they went out and assessed the allotment and assessed the conditions on the allotment, by and large the allotment met the Conley guidelines. To the extent the Conley guidelines were not met, it was with the nesting criteria. And as pointed out by counsel and as the record demonstrates, the nesting criteria in this area is difficult to achieve simply because of its elevation, snowpack, and those types of weather-related issues not associated with livestock grazing. I would point the Court to the decision notice here, and it's in the excerpts of record at 39 through 41, on the guidelines that the Forest Service imposed upon grazing to address not only sage-grouse issues, but other issues associated habitat issues on the allotments. Counsel, you've exceeded your time. Please wrap up. Thank you. I think what I would just like to conclude is, in regards to why not an EIS, this is a very robust DA. And I would suggest to Your Honor, the reason an EIS is not required is the decision here was, do we continue livestock grazing on these allotments? It's not an issue of overall forest-wide management or sage-grouse on a forest-wide scale. The issue here in the project and the action was livestock grazing. And when you put it in that context, I would submit to the Court that an environmental assessment and a FONSI was the appropriate level of NEPA review, and in this case was very robust. The only difficulty I have with that is that the National Forest Management Act requires the Forest Service to ensure species diversity when looking at any project. So how does that obligation fit into the question whether or not grazing should continue? Your Honor, the Forest Service does have that obligation under NIFMA. And as has been pointed out, the sage-grouse have been used as a proxy for, or sage-brush, excuse me, have been used as a proxy for the management indicator species. In terms of sage-grouse and sage-brush, I think we can only go on the best science here, and that's Connelly. So your answer is that because Connelly says that there is adequate habitat to sustain a population, that meets the Forest Service obligation under the National Management Forest Act. That, Your Honor, and recognizing the record on this particular area and the presence or absence of sage-grouse. If you're going to pick an area and look at it, and you go to the periphery of sage-grouse distribution, you're likely to find or you could find exactly what is found in this case, very little sage-grouse activity. But the habitat's fine. So I guess my point here is I don't think we can criticize the Forest Service for maintaining the habitat, which it does control. But we're selecting an area which is way on the periphery of distribution, which is recognized by all experts. So in that instance, I don't think we can fault the agency. All right. Thank you. Thank you. According to this court in the Rittenhouse decision approving proxy methodology, the whole point of managing for an indicator species habitat is to, quote, According to this court's analysis in Lands Council v. Powell, quoting, Why do we want an EIS, Your Honor? Because we would like the Forest Service to actually address in a NEPA document why sage-grouse is no longer viable in the Beaverhead-Deer Lodge National Forest, and what cumulative effects of sagebrush management, cattle grazing, drought, global warming, whatever, to take a hard look at why our sage-grouse are gone, what it will take to recover them, and perhaps even more significantly, what effect this has had on other species. And they keep talking about looking at the habitat and saying, well, it looks like sage-grouse habitat still. What about impacts of cattle grazing on loggerhead shrike, sage sparrows, sage fosters, sage lizards, pygmy rabbits, burrowing owls, bird sparrows, long-billed killews? Not even attempted. Nowhere in the record. Counsel, what's your response to opposing counsel's observation that commonly says that cattle grazing has no effect on sage-grouse habitat? Well, my response to that is to quote Connolly himself, and we did this in the record at page 179 from Connolly, and I'm not going to quote the whole thing, but I would encourage you to look at the whole statement. He says, Livestock, grazing, weather patterns, and fire were the only known factors occurring throughout most of the range of sage-grouse that could be related to widespread population declines through deterioration, loss, or fragmentation of habitat, which is what plaintiffs are complaining about. What he's saying is like what the cigarette company said for years. You cannot prove beyond reasonable doubt that smoking causes cancer. There's just this wonderful relationship that when we were eradicating the habitat, they happened to disappear, but you can't go back and prove that that's the reason. Has there ever been a – is why it's significant. Has there ever been an EIS done in this area? There was the gravelly sage-grouse EIS that was done and also said viability is outside the scope of analysis because there's no breeding habitat in here. Let me ask one more question. It's suggested in the court's ruling that you waived the opportunity to object to the condition of a lot of species in the area. Is that accurate? Waived the opportunity to object to what? That you waived any arguments about other species in the area. No, that's absolutely not true. That's what he said, the court said. That you limited your argument to the sage-grouse. No, I don't believe that's true at any point because our arguments from day one have been that the sage-grouse is an indicator species for the most diverse habitat in North America. All right. Thank you, counsel. Thank you to both counsel for interesting arguments. The case is argued and submitted for decision by the court. The final case on calendar for argument is Equality Center v. Kimball.
judges: Kozinski, Fletcher, Rawlinson